THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DANIEL KOSMICKI, | ) | 4:07CV3023 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| BURLINGTON NORTHERN | ) | |
| SANTE FE RAILWAY | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Daniel Kosmicki brings this action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111, *et seq.*, claiming that his former employer, Burlington Northern Sante Fe Railway Company ("BNSF"), discriminated against him by terminating his employment because of a perceived disability, a brain injury. Defendant BNSF has filed a motion for summary judgment (filing 35). For the reasons that follow, I shall grant the defendant's motion.

## I.  UNDISPUTED MATERIAL FACTS

For purposes of this motion for summary judgment, the parties agree that these are the undisputed facts. (Filing 36, Br. Supp. Def.'s Mot. Summ. J.; Filing 46, Br. Opp'n Def.'s Mot. Summ. J.; Filing 49, Reply Br. Supp. Def.'s Mot. Summ. J.)[1]

---

[1]For reasons of judicial economy, I have not cited specific exhibits in the record that establish facts that the parties admit as true for purposes of the pending motion for summary judgment. I have added citations when I have inserted additional undisputed facts to the parties' stipulated facts. I also note that parts of the evidentiary materials submitted in conjunction with the pending motion for summary judgment are confusing and create possible authentication problems. For example, there are two declarations that refer to "attached" exhibits by the wrong number. (*See*

1.  Plaintiff Daniel Kosmicki was employed by the defendant, Burlington Northern Sante Fe Railway Company ("BNSF"), as a conductor and engineer between 1997 and December 2004.

2.  Ron Hall was the BNSF Superintendent of Operations for the Nebraska Division.

3.  Sharon Clark, D.O., M.P.H, is the BNSF Field Medical Officer in the Medical and Environmental Health Department and is responsible for evaluating when an employee should be returned to duty after an employee has been on medical leave.

4.  Randall Luther is the General Director of the BNSF Labor Relations

---

Filing 76, Decl. of Sharon Clark, referring to attached Exhibit 76 as her curriculum vitae, which is actually Exhibit 77, and referring to Exhibit 77 as medical questionnaire completed by plaintiff, which is actually Exhibit 78; Filing 73, Decl. of Ronald L. Hall, referring to attached Exhibit 73 as the BNSF Policy for Employee Performance and Accountability, which is actually Exhibit 74.) However, because neither party objects to the exhibits on authentication grounds, I shall consider the evidence. *Sugarbaker v. SSM Health Care*, 190 F.3d 905, 911 (8th Cir. 1999) (plaintiff must show prejudice by district court's reliance on unauthenticated documents in ruling on defendant's summary judgment motion); *Dautremont v. Broadlawns Hosp.*, 827 F.2d 291, 294-95 (8th Cir. 1987) (plaintiff failed to demonstrate reversible error when district court considered unauthenticated and unverified documents in ruling on motions, and plaintiff failed to object to such deficiencies); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2722, at 382-85 (1998) ("To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence. . . . As is true of other material introduced on a summary-judgment motion, uncertified or otherwise inadmissible documents may be considered by the court if not challenged. The objection must be timely or it will be deemed to have been waived.") (footnotes omitted).

Department and has responsibility for labor relations matters, including disciplinary actions.

5. A conductor's duty is to make sure the engineer is obeying all speed restrictions and that all signals are being followed; keep track of all bills of lading; ensure the train complies with all the rules for train make-up; do computer work upon arrival at the terminal and when leaving the terminal; and throw switches to get the train lined into the yards correctly. A conductor performs safety-sensitive functions.

6. A locomotive engineer is in immediate, direct control of the motion of a train. The locomotive engineer is responsible for obeying all directions and signals and controlling train movements (i.e., stopping, starting, backing) and speed between stops. Beyond these duties, the locomotive engineer must always exercise discretion, care, and vigilance in moving the train so as to prevent injury or damage. The locomotive engineer must be a sophisticated information processor and controller of a very complex, and often difficult-to-monitor, man-machine system. The locomotive engineer must possess the following skills, knowledge, and abilities:

    a. Perceptual/motor coordination, i.e., the ability to perceive information which affects the safe control of the train via the brake and power systems.

    b. The ability to anticipate and take control (throttle, brake) sufficiently in advance of such territorial features as curves, grades, and grade crests, so as to safely control the train at all times.

    c. The ability to communicate clearly via the train radio to the train dispatcher and crew.

    d. A thorough operational knowledge of how to operate the train within the

       context of the operating territory to which the locomotive engineer is assigned.

   e.     The knowledge and ability to account for the impact of terrain features on track-train dynamics.

   f.     A thorough knowledge of the content and application of operating rules, which are safe operating procedures in written form.

   g.     The ability to account for the effects of changes in train make-up on train handling.

   h.     A sound and practical understanding of the type and magnitude of physical forces which can develop within his train and the degree for which he can control them under various circumstances. A locomotive engineer performs safety-sensitive functions.

   7.     Kosmicki received six months of training to be an engineer, both at the BNSF Technical Training Center and by operating trains with an experienced engineer. After the training, Kosmicki continued to work as a conductor and could be called to work as an engineer as needed.

   8.     On January 23, 2004, Kosmicki was sent notice of a formal investigation to be held on January 30, 2004, related to charges that he had made between 20 to 30 phone calls to his wife from his cell phone while he was working as a conductor on a train.

   9.     It was Kosmicki's responsibility to notify the crew caller that he needed to be laid off from work for an investigation on January 30, 2004. Kosmicki failed to appear for his investigation on January 30, 2004, because he had accepted a call

4

from the crew caller to go on duty and take a train to Ravenna, Nebraska, on January 29, 2004, and he was returning from Ravenna at the time of his investigation.

     10.    Section 3.3 of the BNSF Drug and Alcohol Policy requires that employees who are taking over-the-counter medication or prescription medication which may have an adverse effect on an employee's judgment, alertness, coordination, and reaction/response time are required to consult with his or her physician to ensure that it is safe for the employee to work while taking the medication if the employee is uncertain of the adverse side effects. It is a violation of this policy for an employee to work while taking medication which has an adverse effect on an employee's ability to work safely.[2]

---

    [2]Section 3.3 states:

    Employees taking either prescribed or over the counter medications must be knowledgeable of potential adverse effects these medications have on judgment, alertness, coordination, and reaction/response time. If unclear about the effects of a medication the employee must notify their private health care provider(s) of the full scope of assigned duties to ensure that the use of the substance at the prescribed dosage level is consistent with the safe performance of his/her duties. In the event the employee is being treated by more than one medical practitioner, at least one treating medical practitioner must be informed of all medications authorized or prescribed and has determined that use of the medications is consistent with the safe performance of the employee's duties (and the employee has observed any restrictions imposed with respect to use of the medications in combination)[.]

    *An employee taking prescription medication may be in violation of this policy if* the prescription is not in the employee's name, or is not taken at the prescribed dosage level, or *the medication has an adverse effect on the employee's ability to work safely*.

(Ex. 61, Def.'s First Set of Request for Admissions, Request 3 & Attach. B (emphasis

11. On January 27, 2004, Kosmicki was treated by psychiatrist Walter Duffy, M.D., and Tina Benedict Best, APRN. Benedict Best prescribed Risperdal for Kosmicki. Kosmicki informed Benedict Best that he worked as an engineer, but did not get into the specific details of his duties. Kosmicki testified in his deposition that he told Ms. Best "that I was an engineer, and . . . I was on the conductor's extra board." Kosmicki stated, "I don't believe I got in too specific a detail about the duties of an engineer. I mean, I think any person would know that an engineer drives the train." (Filing 37-3, Ex. 59, Depo. of Kosmicki, at CM/ECF p. 13.) Kosmicki began taking 1 mg. of the Risperdal twice a day on January 27, 2004. Kosmicki does not remember if he had any side effects from taking Risperdal.

12. On February 6, 2004, Hall sent a letter to Kosmicki notifying Kosmicki that he was being removed from duty due to concerns regarding Kosmicki's ability to work safely based upon his conduct of calling his wife repeatedly and problems with anger displayed at work. Kosmicki was informed that he was to contact Angela Bailey, the Regional Medical and Environmental Health Manager, in order to return to work and that he would need to be released by the BNSF Medical and Environmental Department.

13. On February 12, 2004, Kosmicki signed a release of information at Premier Psychiatric Clinic, allowing the clinic to release information to Angela Bailey with the BNSF. The release was signed to facilitate Kosmicki's return to work. Dr. Duffy provided a handwritten note to the BNSF stating that Kosmicki was safe to continue working while he was receiving treatment from Dr. Duffy.[3] Dr. Duffy also

---

added).)

[3] Dr. Duffy's note, dated February 13, 2004, stated: "Dan is receiving txx for his symptoms. This treatment would not interfere with his work duties. I have determined he is fit to return to work at this time." (Presumably, Dr. Duffy's reference to "txx" means "tx," the medical abbreviation for "treatment.") (Filing 37-

6

sent to the BNSF Kosmicki's treatment notes, which indicated that he had been prescribed Risperdal.

15. On February 20, 2004, Kosmicki was issued a Fitness for Duty Recommendation which allowed him to return to work.

15. Kosmicki was dismissed from his employment with the BNSF on March 31, 2004, as a result of the formal investigation which was held on March 16, 2004, regarding Kosmicki's cell-phone use on a moving train while working as a conductor and being discourteous. Specifically, Kosmicki was found to have "violated BNSF's General Code of Operating Rules 1.10 (Games, Reading or Electronic Devices) and General Code of Operating Rules 1.6 Conduct (2. Negligent, 6. Quarrelsome, and 7. Discourteous with added paragraph in Item 14 System Special Instruction No. 8[)]." (Filing 37-19, Ex. 73, Decl. of Ronald Hall ¶ 18.)[4]

16. On June 9, 2004, Kosmicki agreed to a leniency reinstatement of his position which provided that Kosmicki must have both a mental examination and a physical examination with releases to return to work from both, a meeting with Ron Hall, and a six-month follow-up interview with Ron Hall.

17. The purpose of the mental evaluation was to determine Kosmicki's cognitive abilities, given the fact that his speech was observed to be slowed and

---

5, at CM/ECF p. 36.)

[4]Rule 1.10 states: "Unless permitted by the railroad, employees on duty, must not . . . [u]se electronic devices not related to their duties." An amendment to the rule states that "[a]ll crew members are prohibited from using cell phones . . . when their train or engine is moving." (Filing 37-21, Ex. 75, General Code of Operating Rules & Amendment.) It is not clear to the court where Rule 1.6 and the "added paragraph in Item 14 System Special Instruction No. 8" are located in the record.

7

slurred.[5]  (Decl. of Clark ¶ 7.)  The purpose of the physical evaluation was to make sure that Kosmicki met the physical requirements required by the Federal Railroad Administration for engineers because of the length of time that had passed since he last worked.  (Ex. 45.)

      18.   The BNSF was advised by Judy Byrns, Ph.D., and Corphealth that Kosmicki was fit for duty based upon the neuropsychological evaluation.  Kosmicki was also cleared by his physical examination.  Kosmicki did not disclose to either Dr. Byrns or to the physician performing the physical examination that he had been taking Risperdal and Ativan which had been prescribed by either Dr. Duffy or Benedict Best.  On July 9, 2004, the BNSF Medical and Environmental Department issued a Fitness for Duty Recommendation which would permit Kosmicki to return to work.

      19.   On July 13, 2004, Kosmicki had a meeting with Jerry Jensen, Kosmicki's union representative; Ron Hall; Greg Wright, the BNSF Director of Administration; Jack Landon, BNSF Safety Director; and Dennis Gengler, BNSF Manager Field Training, prior to Kosmicki's reinstatement.  During the meeting, Kosmicki's representative indicated that Kosmicki did not feel comfortable working as an engineer.  Hall instructed Kosmicki not to work as an engineer and not to take calls to work as an engineer until cleared to do so by Ron Hall.  During this meeting, Kosmicki was specifically asked if he was taking any medication, and Kosmicki

---

[5]Plaintiff's brief in opposition to the defendant's motion for summary judgment states, "The real purpose of the mental evaluation was to determine if Kosmicki had 'brain damage' as Mr. Hall suspected. (Dep. Of Hall, 21:10-22:14)."  However, the cited portion of the deposition was not included in the plaintiff's evidence.  (Filing 47).  In the portion of Hall's deposition that *was* included in Plaintiff's evidence, Hall admits that he "thought that [Kosmicki] may have some type of head injury as a result of his boxing" and that he "said that to people more than once." (Filing 47-6, at CM/ECF p. 39.)

8

specifically denied that he was taking any medication. At Kosmicki's deposition on August 31, 2007, Kosmicki had no memory of this meeting, other than recalling that he met with Greg Wright.

20.     On July 23, 2004, Kosmicki, in violation of Ron Hall's instructions, accepted a call to work as an engineer on a train run to Ravenna, Nebraska. Hall was advised of this after Kosmicki was already operating the train. Hall ordered the train to be stopped between Waco and York and instructed Mick Phillip, the Road Foreman for Engineers, to board the train for the remainder of the trip. Hall issued a Notice of Investigation to Kosmicki for violating instructions. At his deposition on August 31, 2007, Kosmicki had no memory of being told not to work as an engineer or working in violation of this requirement.

21.     Questions arose regarding Kosmicki's ability to operate a train safely based upon Phillip's observation of Kosmicki on the trip between Waco and Ravenna on July 23, 2004, because Phillips had to repeatedly remind Kosmicki to initiate the whistle and bell signal for grade crossings, and Kosmicki used an excessive amount of dynamic braking. The disciplinary charges against Kosmicki for this incident were given alternative handling, as the BNSF dropped the disciplinary charges in exchange for Kosmicki's agreement to attend training and simulator testing at the BNSF Technical Training Center in Overland Park, Kansas. The BNSF Medical and Environmental Department was consulted because it was unclear why Kosmicki was having difficulty working as an engineer. Since Kosmicki had not raised any medical issue as being an explanation for his performance issues, it was decided that if Kosmicki could successfully pass the simulator testing, the BNSF would require that full forensic neuropsychological testing be performed. However, if Kosmicki was unable to successfully pass the simulator testing, Kosmicki would be removed from performing any safety-sensitive duty and the burden would be on Kosmicki to prove

9

that he was fit for duty.[6]

22.    Kosmicki attended training and took simulator tests the week of August 13, 2004, through August 19, 2004. Kosmicki was unable to pass any of the simulator tests. Hall removed Kosmicki from duty on August 20, 2004, due to Hall's concern that Kosmicki could not operate a train safely. Kosmicki had no memory of his training in Topeka and taking simulator testing at his deposition on August 31, 2007.

23.    On September 16, 2004, Bryan Asher and Wyatt Schroeder, BNSF Technical Training Managers, prepared a memorandum describing the results of the simulator tests Kosmicki had taken in August 2004. Mick Phillips also prepared a report of his experience riding the train between Waco to Ravenna with Kosmicki on July 23, 2004, at the request of Ron Hall. In reviewing these documents, Sharon Clark, D.O., M.P.H., issued a Fitness for Duty Recommendation stating that Kosmicki was restricted from performing any safety-sensitive duties. This limitation would restrict Kosmicki from working as a conductor and an engineer.

24.    On September 22, 2004, Kosmicki contacted Angela Bailey and related that the reason he could not pass the simulator test in Overland Park was because of the medication he was taking. Sharon Clark then instructed Angela Bailey to determine from Kosmicki's treating provider the identity of medications and the timelines for both the issuance of the prescriptions and the use of the medications.

---

[6]The plaintiff claims that he was sent to simulator testing because Hall "still believed Kosmicki's erratic behavior was caused by 'brain damage'." (Filing 46, at 7.) However, the portion of Hall's deposition cited to support this "fact" only states: "I was under the assumption that Mr. Kosmicki could not work as an engineer and that there was something going on. I don't—I didn't assume to know what it was, I just knew that he was having severe problems in concentration and memory . . . ." (Filing 47-6, Depo. of Hall 28:10-17.)

Pursuant to this inquiry, Dr. Duffy's office provided information indicating that Kosmicki had been taking Risperdal and Ativan between March to July 2004, and had been taking Lexapro starting in July 2004. Risperdal, Lexapro, and Ativan all individually can have adverse side affects of altered mentation, alertness, and agility. Specifically, Risperdal, Lexapro, and Ativan each may cause sleepiness, somnolence, fatigue, and dizziness. Ativan may cause intermittent memory impairment.

25. Kosmicki did not disclose that he was taking Risperdal or Ativan on the medical questionnaire forms that he filled out for his neuropsychological evaluation in June 2004, or for his physical examination in July 2004.

26. On September 29, 2004, Hall issued two Notices of Formal Investigation to Kosmicki. The first Notice of Formal Investigation (No. 04-243) focused on Kosmicki's alleged violation of BNSF's Drug and Alcohol Policy for taking prescription medication which affected his ability to work safely. The second Notice of Formal Investigation (No. 04-244) was for Kosmicki's alleged dishonesty in failing to provide accurate factual information to medical providers in June and July 2004.

27. On November 8, 2004, both of the investigations regarding Kosmicki were held. Kosmicki was present for both investigations and represented by Tim Engler, Local Chairman-United Transportation Union-F.

28. Kosmicki's defense to the charge of violating BNSF's drug policy was that Kosmicki had advised BNSF of the fact he was taking Risperdal when his encounter notes with Dr. Duffy and Tina Benedict Best, dated February 12 and 13, 2004, were faxed to Angela Bailey, and that Dr. Duffy told him that he could work as an engineer while taking the medication.

29. Kosmicki's defense to the charge of dishonesty in providing medical

information was that there was insufficient proof that he filled out the information in question and that he was having memory problems, as evidenced by an encounter note from Tina Benedict Best on July 8, 2004.

30. On December 1, 2004, and after consultation with the BNSF Director of Employee Performance and Boyd Andrew, the BNSF General Manager for Nebraska, Hall issued a letter of dismissal to Kosmicki because he "violated [BNSF] Code of Operating Rules—Rule 1.6 (Conduct) by your dishonesty in failing to provide complete and factual information for treatment and medications on a medical screening and examination on June 25, 2004 at Lincoln Behavioral Health Clinic and on medical history form submitted on July 1, 2004 for a return to work medical examination." (Investigation No. 04-244). (Filing 37-3, Depo. of Kosmicki, Ex. 32.)

31. On December 8, 2004, and after consultation with the BNSF Director of Employee Performance and Boyd Andrew, the BNSF General Manager for Nebraska, Hall issued a letter of dismissal to Kosmicki based upon the charge of violation of the BNSF Drug and Alcohol Policy for Kosmicki's working while taking prescription medication which affected Kosmicki's ability to work safely. (Investigation No. 04-243).[7] (Filing 37-3, Depo. of Kosmicki, Ex. 33.)

32. Kosmicki's union representative appealed the dismissal for dishonesty

---

[7]The letter stated:

[I]t was determined that you violated **[BNSF] Drug and Alcohol Policy Section 3.3** by reporting to duty and working during the period of March through August 19, 2004, while taking medications which affected your ability to work and train safely and **General Code of Operating Rules—Rule 1.6 (Conduct) Employees must not be careless of the Safety of themselves or others** while working and training during the period of March through August 19, 2004, placing at risk, the personal safety of yourself, your co-workers, and the general public.

12

in Investigation No. 04-244 on January 28, 2005, to Boyd Andrew, the BNSF General Manager. On March 21, 2005, Andrew affirmed the dismissals in both Investigation Nos. 04-243 and 04-244.

33.     Kosmicki further appealed the dismissal in Investigation No. 04-244 via his union representative to Milton Siegele, the BNSF Assistant Vice President for Labor Relations, on June 26, 2005. The ruling on the appeal was affirmed by Siegele on September 11, 2006.

34.     Kosmicki further appealed the dismissal in Investigation No. 04-244 to arbitration which is "presently being handled by the UTU," but he did not appeal the dismissal in Investigation No. 04-243.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also Egan v. Wells Fargo Alarm Servs.*, 23 F.3d 1444, 1446 (8th Cir.1994). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "'sufficient probative evidence [that] would

13

permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The Eighth Circuit Court of Appeals has stated that "summary judgment should be used sparingly in the context of employment discrimination . . . where direct evidence of intent is often difficult or impossible to obtain." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1117 (8th Cir. 2006) (citing cases). However, the Court of Appeals has also stated that "no separate summary judgment standard exists for discrimination or retaliation cases and that such cases are not immune from summary judgment." *Id*. at 1118 (citing cases).

> [A]lthough Rule 56 contains only one standard, we must exercise *particular* caution when examining the factual question of intent to ensure that we dutifully extend all justifiable inferences in favor of the non-moving party. Where reasonable fact finders could extend an inference in favor of the non-moving party without resorting to speculation, we may not declare the inference unjustifiable simply because we might draw a different inference. Viewing the evidence as a whole, and in this deferential light, we must deny summary judgment where a reasonable jury could find in favor of the non-moving party.

*Id*. (internal citations omitted).

### B. Kosmicki's Termination

Kosmicki alleges that the defendant violated the ADA when it terminated his

employment because of a perceived[8] brain injury. Specifically, the plaintiff argues that "Ron Hall, Dan Kosmicki's boss, thought [Kosmicki] had a brain injury. Over a period of January through June of 2004, Mr. Hall continued to take steps to have Mr. Kosmicki removed from his job (fired) because of that perceived disability." (Filing 46, Pl.'s Br. Opp'n Mot. Summ. J. at 12.)

> To prove disability discrimination, an employee must show that (1) the employee is disabled within the meaning of the ADA; (2) the employee is qualified (with or without reasonable accommodation) to perform the essential functions of a job; and (3) the employee suffered an adverse employment action because of the disability. Once a plaintiff has proven a *prima facie* case, the burden then shifts to the employer to offer a legitimate, nondiscriminatory reason for the adverse employment action. If the employer does so, the burden shifts back to the employee to prove that the reason was pretextual. To prove pretext, the employee must do more than show that the employment action was ill-advised or unwise, but rather must show that the employer has offered a "phony excuse."

*Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1034 (8th Cir. 2005) (internal citations omitted).

The pivotal issue in this case is whether BNSF's legitimate and

---

[8] In other words, Kosmicki claims that BNSF "regarded him" as having a disability. "For ADA purposes, the definition of 'regarded as disabled' assumes that the individual is not actually disabled." *Christensen v. Titan Distrib., Inc.*, 481 F.3d 1085, 1092 n.2 (8th Cir. 2007) (citing *Wenzel v. Missouri-American Water Co.*, 404 F.3d 1038, 1041 (8th Cir. 2005)). "An employer regards an employee as disabled if it 'mistakenly believes that the employee has an impairment (which would substantially limit one or more major life activity), or [it] mistakenly believes that an *actual* impairment substantially limits one or more major life activity.'" *Id.* at 1093 (quoting *Chalfant v. Titan Distribution, Inc.*, 475 F.3d 982, 988-89 (8th Cir. 2007) (in turn quoting *Wenzel*, 404 F.3d at 1041)).

15

nondiscriminatory reasons for Kosmicki's termination were pretextual, or "phony excuse[s]." *Id.* Thus, I shall assume for purposes of this summary judgment motion that Kosmicki has established a prima facie case of disability discrimination based on a perceived disability. *Stewart v. Independent School Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007) ("[I]f an employer has articulated a legitimate reason for its actions, it is permissible for courts to presume the existence of a prima facie case and move directly to the issue of pretext and the determinative issue of causation when bypassing the prima facie case analysis leads to clarity in framing the issues under review.").

BNSF has presented evidence establishing that its reasons for terminating Kosmicki's employment were (1) Kosmicki's violation of Rule 1.6 of the BNSF Code of Operating Rules for his dishonesty in failing to provide complete factual information regarding treatment and medications in a medical screening and examination on June 25, 2004, and on a medical history form submitted on July 1, 2004, during a return-to-work medical examination; and (2) Kosmicki's violation of the BNSF Drug and Alcohol Policy when he worked while taking prescription medication which affected his ability to work safely. Kosmicki does not dispute that he violated company policy in these ways.

BNSF's stated reasons for Kosmicki's discharge were legitimate and nondiscriminatory because the Eighth Circuit Court of Appeals has repeatedly held that "insubordination and violation of company policy are legitimate reasons for termination" of employment. *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) (citing cases). *See also Johnson v. AT&T Corp.*, 422 F.3d 756, 762 (8th Cir. 2005) (employee's violation of company policy is legitimate reason for subsequent termination).

Because the defendant has articulated legitimate, nondiscriminatory reasons for terminating Kosmicki's employment, it is Kosmicki's burden to present evidence that

the defendant's articulated reasons are pretextual. While not clearly stated, it appears that Kosmicki's only argument regarding pretext is that the *real* reason for Kosmicki's discharge was Hall's suspicion that Kosmicki had brain damage—that is, that BNSF's stated reasons have "no basis in fact." *E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 570 (8th Cir. 2007) (plaintiff may prove pretext by showing that employer's stated reason for adverse employment action has "no basis in fact"). (Filing 46, Pl.'s Br. Opp'n Mot. Summ. J. at 5 (response to ¶ 17), 7 (response to ¶ 21), 12 (Hall took steps to have Kosmicki removed from job because of perceived disability).) In such cases, the "relevant inquiry is whether [BNSF] *believed* [Kosmicki was] guilty of [the] conduct justifying discharge." *Scroggins v. University of Minnesota*, 221 F.3d 1042, 1045 (8th Cir. 2000) (quotation and citation omitted).

Here, there is no evidence suggesting anything other than BNSF's honest and well-supported belief that Kosmicki engaged in conduct justifying his discharge—that is, (1) Kosmicki failed to report the medication he was taking on two medical questionnaires in June and July 2004 during fitness-for-duty examinations, and (2) that Kosmicki violated written company policy by working as an engineer while simultaneously taking medication that affected his ability to work safely from March to August 2004.

While Kosmicki argues that BNSF knew that he was taking Risperdal by virtue of the information sent by Dr. Duffy's office to BNSF on February 13, 2004, BNSF was never made aware of the continued prescribing of Risperdal or the additions of Lexapro and Ativan after March 2004. In fact, on July 13, 2004, Kosmicki told Jerry Jensen, Kosmicki's union representative; Ron Hall, Kosmicki's supervisor; Greg Wright, the BNSF Director of Administration; Jack Landon, BNSF Safety Director; and Dennis Gengler, BNSF Manager Field Training, that he was not taking any medication. In any case, Kosmicki admits that the Risperdal information provided to BNSF by Dr. Duffy was not made with full disclosure by Kosmicki regarding the "full scope of assigned duties," as is mandated by Section 3.3 of the BNSF Drug and

Alcohol Policy (requiring employee to "notify their private health care provider(s) of the full scope of assigned duties to ensure that the use of the substance at the prescribed dosage level is consistent with the safe performance of his/her duties").

To prove pretext, Kosmicki must both discredit BNSF's asserted reasons for his discharge—which, as discussed above, he has failed to do—*and* show circumstances that permit drawing a reasonable inference that the real reason for his discharge was Kosmicki's perceived disability. *Gilbert v. Des Moines Area Community College*, 495 F.3d 906, 918 (8th Cir. 2007). As to the latter showing, Kosmicki must "show a genuine issue of material fact as to whether [BNSF] actually fired him because of his disability." *Kiel*, 169 F.3d at 1135. The ultimate question is whether Kosmicki has presented evidence of "'conduct or statements by persons involved in [the employer's] decision-making process reflective of a discriminatory attitude sufficient to allow a reasonable jury to infer that that attitude was a motivating factor in [the employer's] decision to fire [the plaintiff].'" *Id*. (quoting *Feltmann v. Sieben*, 108 F.3d 970, 975 (8th Cir. 1997)).

The only evidence of a decision-maker revealing a discriminatory attitude is Ron Hall's deposition testimony that he thought Kosmicki might have some type of head injury as a result of his boxing. However, Hall also stated that he simply knew "that there was something going on. . . . I didn't assume to know what it was . . . ." (Filing 47-6, Depo. of Hall 28:10-17.) There is no evidence that Hall's suspicions were confirmed by any of Kosmicki's medical examinations, or that Hall took any sort of action based on his suspicion. On the contrary, there is only evidence that Hall, after thorough investigation and medical examination, discharged Kosmicki for repeated violations of company policy—policy that was designed to prevent injury to the public and other BNSF employees that could be caused by train personnel whose coordination, judgment, or reaction time are impaired due to medication.

In sum, Kosmicki has not discredited BNSF's stated reasons for his discharge,

nor has he produced sufficient evidence that would permit a reasonable jury to find that disability discrimination was a motivating factor in Kosmicki's termination and that Kosmicki's violation of company policy was a "phony excuse" for getting rid of Kosmicki. *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005) ("An employee's attempt to prove pretext requires more substantial evidence than it takes to make a prima facie case because unlike evidence establishing a prima facie case, evidence of pretext and retaliation is viewed in light of the employer's justification.") (quotations and alterations omitted). Therefore, the defendant's motion for summary judgment must be granted and this case shall be dismissed with prejudice.[9]

Accordingly,

IT IS ORDERED:

1. The defendant's motion for summary judgment (filing 35) is granted;

2. The defendant's motion to strike and objection to Plaintiff's Exhibit 83 (filing 48) is denied as moot, as the court did not consider the exhibit;

3. The defendant's motion in limine (filing 54) is denied as moot;

4. By separate document, judgment shall be entered in favor of the defendant and against the plaintiff, providing that the plaintiff shall take nothing and this matter is dismissed with prejudice.

---

[9] Because I have resolved this matter assuming the ADA applies, I need not consider Defendant's arguments that the Railway Labor Act, 45 U.S.C. § 151, *et seq.*, precludes the application of the ADA or that Kosmicki's claims are barred by the doctrine of collateral estoppel. (Filing 36, Br. Supp. Def.'s Mot. Summ. J. at 27-35.)

February 21, 2008.	BY THE COURT:
	s/ *Richard G. Kopf*
	United States District Judge

20